UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE No. 8:09-CR-502-T-17TGW

GUSTAVO TELLES-MONTENEGRO

## REPORT AND RECOMMENDATION

The defendant, who was indicted for unlawfully transporting five illegal aliens, as well as for re-entering the United States after deportation, has filed a motion to suppress evidence obtained by law enforcement after a border patrol agent stopped the vehicle he was driving on October 2, 2009 (Doc. 17). An evidentiary hearing established that law enforcement had a reasonable suspicion that there were illegal aliens being transported in the vehicle. Therefore, the stop of the vehicle was legal. Accordingly, I recommend that the motion to suppress be denied.

I.

One witness testified at the evidentiary hearing. The Government called Anthony Fiorita, a Senior Patrol Agent for the United States Border Patrol in Tampa. The defendant cross-examined this witness,

but did not call any witnesses of his own, or proffer any other evidence at the hearing. During the hearing, the following material evidence was adduced.

Agent Fiorita has been employed with the United States Border Patrol for twelve and one-half years. He came to Tampa in July 2004, to join an ongoing highway operation to interdict human trafficking on Interstate 75 (I-75). Previously, he was employed by the United States Border Patrol performing highway and border patrol operations in New Mexico.

Agent Fiorita testified that there have been about one hundred fifty smuggling events in this area over the past six years. He explained that smuggling organizations bring illegal aliens, predominantly Hispanics from Mexico or Central America, across the southwest border of the United States into states such as California, Arizona, New Mexico, and Texas. The organizations usually contract Mexican nationals to drive the illegal aliens in larger vehicles, such as vans or sport utility vehicles, which are favored because they hold more passengers and it is easier to conceal them inside. The vehicles are typically registered in a southwest border state. Agent Fiorita added that the vehicles are frequently unkempt to minimize costs, but mechanically they are well maintained so they can drive long distances.

On October 2, 2009, Agent Fiorita was patrolling I-75 to interdict human smuggling. In Agent Fiorita's experience, I-75 is a major corridor for alien smuggling. He explained that I-75 is a major north-south artery that intersects with several interstate highways that originate in the southwest corridor, and it is faster than traveling county and state roads with traffic lights and congestion.

At approximately 9 a.m., Agent Fiorita's vehicle, which displayed the border patrol insignia, was stopped in the I-75 median at mile-marker 312, along with two other agents in their marked border patrol vehicles. Agent Fiorita was observing the southbound traffic. He noticed in the far right lane a Hispanic-looking male driving a green Chevrolet Astro minivan with body damage on the driver's side and displaying California tags ("the minivan")(see Doc. 24, Exs. 1, 6).[1] The minivan appeared to be riding low, considering that only one person was visible in the vehicle. The dark

---

[1]Agent Fiorita initially testified that the minivan had Arizona tags, but later corrected his testimony. A photograph of the registration tag on the minivan (Doc. 24, Exs. 1, 2) confirms that the minivan had California tags.

tinted rear windows obstructed Agent Fiorita's ability to see inside the vehicle's rear compartment (see Doc. 24, Ex. 6).[2]

Agent Fiorita pulled onto the roadway to get a closer look at the minivan. Border Patrol Agent Desmond Garcia followed in his patrol vehicle, although he was not directly behind the minivan. When Agent Fiorita initially saw the minivan, it was driving with the flow of traffic at approximately 70 miles per hour, which is the posted speed limit. However, when Agent Fiorita pulled into traffic, the minivan slowed down.

Agent Fiorita caught up with the minivan within two miles and followed behind it. Agent Fiorita estimated that the minivan had slowed to 55 or 60 miles per hour. He kept pace with the minivan, and traffic was passing them. Agent Fiorita stated that it is uncommon for a driver to slow to 10 to 15 miles below the speed limit upon encountering a patrol car. The vehicle still appeared to be driving low, and there was no luggage or tools on the exterior to weigh the vehicle down. Further, the vehicle appeared

---

[2]Each side of the minivan had three windows, and there was a window in the rear of the vehicle (Doc. 24. Exs. 1, 3). The windows were tinted except for the front driver and front-seat passenger windows (id. at Exs. 3,7). Agent Fiorita stated that tinted windows are typical in alien-smuggling vehicles because they conceal the vehicle's contents. He added that a low-riding vehicle suggests that there may be extra weight inside the vehicle.

unkempt, as it had body damage, paint scratches and chips, and abrasions on the bumper. When Agent Fiorita was close enough to read the license tag, he made radio inquiries for a registration check (California tag 6CXE663), a stolen vehicle check, and a lane check (which identifies whether the vehicle had recently come across a border check-point).

After five or ten minutes, Agent Fiorita pulled alongside the minivan and kept pace with it in the left lane, driving approximately 60 miles per hour. Agent Fiorita observed the driver sitting in an unnatural, rigid position and gripping the steering wheel tightly, like he was "scared to death." Agent Fiorita thought he saw a passenger in the right front seat, but he was uncertain. After pulling the patrol car back, and with the sun shining into the vehicle, he noticed what appeared to be an open Powerade drink bottle by the back window, beyond the driver's reach. However, he did not see any other people in the minivan.

Agent Fiorita subsequently pulled his patrol car behind the minivan. The minivan's speed varied between 55 and 70 miles per hour, and it was having trouble maintaining its lane. Specifically, the two tires on the passenger side of the minivan were drifting onto the shoulder of the road. It

appeared to Agent Fiorita that, instead of focusing on the road, the defendant was looking for his patrol car.

At about that time, Agent Fiorita received information that the minivan was registered in California to an individual who had previously been deported at least twice from the United States. This suggested to Agent Fiorita that the minivan was owned by an illegal alien.[3]

Agent Fiorita then pulled his patrol car in front of the defendant's vehicle and looked in his rear view mirror in order to determine if a passenger was in the vehicle and to observe the driver's response.[4] He confirmed there was an individual in the front passenger seat. Agent Fiorita drove slower, but the defendant would not pass his patrol vehicle until he dropped his speed to 45 miles per hour and, even at that speed, the defendant waited before passing him. Agent Fiorita explained that a driver normally passes his patrol car when he reduces his speed. He testified that the

---

[3]Agent Fiorita explained that he did not know at that time if the driver was the registrant. It was later determined that the defendant is not the owner of the minivan.

[4]Agent Fiorita stated that, when he pulled his patrol car in front of the minivan, a second patrol car, driven by Agent Garcia, was not directly behind the minivan. Thus, Agent Garcia's vehicle had "dropped back" and the defendant was not "sandwiched" between two border patrol vehicles. Agent Fiorita added that he did not know if the defendant was even aware that a second border patrol vehicle was present.

defendant's response was consistent with alien smuggling, as those drivers typically do not want to pass patrol cars because they do not want law enforcement to observe their vehicles. When the defendant finally passed Agent Fiorita's patrol car, Agent Fiorita noticed that the defendant was looking dead-ahead, and the passenger had slumped into the seat with his head hidden behind the door frame.

Agent Fiorita followed the minivan for approximately forty minutes. He testified that he had reasonable suspicion to stop the minivan fifteen to twenty minutes into the surveillance, when the defendant passed his patrol car. He continued surveillance in order to observe the defendant's behavior and to get closer to Tampa, where his border patrol office and back-up officers are located. Prior to stopping the minivan, Agent Fiorita conferred with Agent Garcia, who had also been following the minivan, and Agent Garcia told him that he observed the same characteristics.

Agent Fiorita stopped the defendant on I-75 in Hillsborough County, near the Bruce B. Downs exit. Agent Fiorita walked up to the minivan and identified himself to the defendant. After getting no response in English, Agent Fiorita asked the defendant in Spanish his citizenship, to

which the defendant stated he was not a United States citizen. Agent Fiorita inquired whether the defendant had immigration papers which permitted him to be in the United States, and the defendant responded negatively.

When Agent Fiorita looked into the vehicle he discovered five passengers, two of whom were lying on the floor (see Doc. 24, Exs. 7-11).[5] Agent Fiorita asked the defendant if the passengers were Mexican. The defendant said yes. Upon inquiry, the defendant admitted that the passengers were in the United States illegally. The defendant and the passengers were taken into custody and questioned. The defendant gave statements to law enforcement after he received his Miranda warnings.

The defendant was subsequently charged in a two-count indictment with knowingly transporting illegal aliens within the United States for financial gain, and illegally re-entering the United States after deportation, in violation of 8 U.S.C. 1324 and 8 U.S.C. 1326, respectively (Doc. 9).[6] The defendant has filed a Motion to Suppress Evidence and Statements obtained

---

[5]At the hearing, Agent Fiorita identified the defendant as the driver of the minivan and pictures of the vehicle and the passengers (Doc. 24, Exs. 1-11).

[6]The defendant was an alien who had been convicted of methamphetamine possession in 2002 (Doc. 9). He was deported from the United States to Mexico in 2005 (id.).

by law enforcement on the ground that the border patrol agents did not have a reasonable suspicion of criminal activity that would permit stopping the minivan (Doc. 17).

The Government contends that law enforcement had a reasonable suspicion that the minivan was involved in alien smuggling and, therefore, the stop was lawful (Doc. 19). Additionally, the Government argues that, even if there was an unlawful stop, the defendant may still be prosecuted for illegally re-entering the United States because the defendant's identity may not be suppressed as a fruit of an unlawful seizure (id.).

The Motion to Suppress was referred to me for a report and recommendation (Doc. 18). Thereafter, an evidentiary hearing was held, at which the defendant was present, along with a Spanish interpreter (see Doc. 23).

## II.

The crux of the motion is whether law enforcement had a reasonable suspicion of criminal activity to justify stopping the minivan driven by the defendant on October 2, 2009. As the United States Supreme Court stated in Whren v. United States, 517 U.S. 806, 809-10 (1996):

> The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision.

In order to balance an individual's right to personal security with the public interest, law enforcement may briefly stop a vehicle "for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be 'afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989). Under this standard, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002).

The Eleventh Circuit recently expounded on the reasonable suspicion standard (United States v. Lopez-Garcia, 565 F.3d 1306, 1313 (11th Cir. 2009), cert. denied, __ U.S. __, 2009 WL 2222314 (2009)(citations omitted)):

> An "inchoate and unparticularized suspicion or hunch of criminal activity" is not sufficient to meet the reasonable suspicion standard. Rather, an

"officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Furthermore, "[w]hen making a determination of reasonable suspicion, [the court] must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Adopting this perspective is important, as the Supreme Court has observed, because it "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."

The Supreme Court has enumerated a non-exhaustive list of factors that may be relevant when determining whether law enforcement has reasonable suspicion to stop a vehicle for alien smuggling, including the usual traffic patterns of the area, the agent's previous experience with alien smuggling, the behavior of the driver, characteristics of the vehicle, and the apparent Mexican ancestry of the occupants of the vehicle. United States v. Brignoni-Ponce, 422 U.S. 873, 884-87 (1975). Importantly, "[a]lthough each of the series of acts [i]s perhaps innocent in itself ... taken together, they [may] warrant[] further investigation." United States v. Arvizu, supra, 534 U.S. at 274-75; see United States v. Sokolow, supra, 490 U.S. at 9 (holding

that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion).

## III.

In this case, Agent Fiorita articulated numerous specific factors that, in his experience, cumulatively created a reasonable suspicion that the minivan was transporting illegal aliens: (1) the minivan was the kind of large vehicle often used by smugglers to transport illegal aliens; (2) it was driven by a Hispanic-looking male, and Mexican nationals are frequently contracted to drive smuggling vehicles; (3) the minivan was registered in California, a southwestern border state where smuggling vehicles are regularly registered; (4) the minivan was registered to an individual who was deported twice and therefore likely an illegal alien; (5) the minivan was traveling on I-75, a highway known to the agent as a major corridor for alien smuggling; (6) the minivan was riding low, considering that there was only one person visible in the vehicle; (7) the minivan was unkempt and had tinted windows, which is characteristic of smuggling vehicles; (8) when the minivan came into contact with Agent Fiorita's patrol car it reduced its speed dramatically below the speed limit, which is an uncommon reaction for an innocent traveler; (9)

the defendant appeared unnaturally rigid and gripped the steering wheel like he was "scared to death"; (10) the minivan drove erratically (the passenger wheels driving on to the shoulder of the highway) when Agent Fiorita was following it; (11) the defendant was hesitant to pass Agent Fiorita's patrol car, even when Agent Fiorita dropped his speed to 45 miles per hour; (12) the passenger appeared as if he was attempting to conceal himself when the minivan passed Agent Fiorita's patrol car; and (13) there was an open bottle in the rear compartment beyond the driver's reach, but there were no passengers visible past the front row.

Further, Agent Fiorita cogently explained why these factors, when viewed in their totality, created a reasonable suspicion that the minivan was smuggling illegal aliens. Thus, the characteristics of the vehicle were, in his experience, typical of a vehicle transporting illegal aliens. In this regard, Agent Fiorita explained that larger vehicles are favored by alien smugglers because they hold more people, thereby generating greater profits, and that tinted windows and riding low in the back are typical features because the alien smugglers frequently conceal their passengers. The passenger slumping in the seat when the minivan passed Agent Fiorita's

patrol car and what appeared to be an open drink bottle beyond the reach of the driver could also reasonably suggest this minivan was concealing passengers.

Further, the defendant's response to law enforcement's presence was suspicious. Thus, Agent Fiorita testified that a driver traveling innocently does not reduce their speed substantially below the flow of traffic merely because they encounter a patrol car. Agent Fiorita added that the defendant's hesitance to pass him when he slowed his patrol car to 45 miles per hour was consistent with alien smugglers. In this regard, Agent Fiorita explained that alien smugglers do not want to pass patrol cars so law enforcement cannot observe their vehicles. Agent Fiorita also found it suspicious that the defendant appeared to be looking for his patrol vehicle instead of focusing on the road. Moreover, the defendant's appearance, which Agent Fiorita described as "scared to death," is also inconsistent with a person traveling innocently on the highway.

Further, Agent Fiorita was informed that the vehicle was registered to an individual who had previously been deported twice as an illegal alien. Although Agent Fiorita did not know whether the vehicle's

driver was the registrant of the vehicle, vehicle ownership by an illegal alien strongly ties the vehicle to activity involving illegal aliens. That circumstance significantly increases the suspicion that the minivan contains illegal aliens.

Having considered the totality of the circumstances, and giving due weight to the factual inferences drawn by Agent Fiorita, a twelve-year veteran of the United States Border Patrol, the evidence establishes that Agent Fiorita had a reasonable suspicion that the defendant was transporting illegal aliens in the minivan. See United States v. Brignoni-Ponce, supra, 422 U.S. at 884 (the standard requires that officers are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in this country"). Thus, the defendant's conduct was not consistent with a driver innocently traveling on the highway, and Agent Fiorita's observation of numerous characteristics that, in his experience, are typical of alien smuggling, created a reasonable suspicion that the defendant was transporting illegal aliens.

A finding of reasonable suspicion in this case is buttressed by the holdings in  United States v. Bautista-Silva, 567 F.3d 1266, 1268 (11th Cir. 2009); United States v. Cruz-Hernandez, 62 F.3d 1353 (11th Cir. 1995); and United States v. Payne, 555 F.2d 475 (5th Cir. 1977).  In those cases, reasonable suspicion of alien smuggling to justify a traffic stop was found with fewer salient factors than presented here.

The defendant, as indicated, contends that there was insufficient cause to stop the minivan.  In this connection, he has not meaningfully challenged the officer's credibility; rather, the focus of his argument is that the factors considered by Agent Fiorita did not create a reasonable suspicion of criminal activity.  First, the defendant emphasized that he did not violate any traffic laws or engage in any observable illegal conduct (Doc. 17, pp. 2, 3).  However, the absence of observable illegal conduct does not dispel Agent Fiorita's reasonable suspicion of human trafficking.  Thus, the factors enumerated by the Supreme Court as probative of reasonable suspicion do not include observable illegal conduct.  See United States v. Brignoni-Ponce, supra, 422 U.S. at 884-87.  Accordingly, the absence of such conduct is not dispositive of whether there is a reasonable suspicion of criminal activity.

See, e.g., United States v. Arvizu, supra, 534 U.S. at 266; United States v. Cortez, 449 U.S. 411 (1981); United States v. Bautista-Silva, supra, 567 F.3d at 1268; United States v. Payne, supra, 555 F.2d at 475.[7]

The defendant contends further that he "displayed no suspicious behavior" during the surveillance and that his response to the agents' actions, "which ... appeared to be calculated to incite suspicious behavior," was reasonable (Doc. 17, p. 3). In this regard, the defendant argued that it is normal for a driver to slow down when encountering law enforcement. However, Agent Fiorita's uncontroverted testimony was that the defendant's response was abnormal, as drivers traveling innocently do not decrease their speed substantially below the flow of traffic merely because they encounter a patrol car. Additionally, Agent Fiorita testified that the defendant's hesitance to pass his patrol vehicle was consistent with alien smugglers who are trying to avoid observation of their vehicles by law enforcement.

---

[7]There would be little need for the reasonable suspicion standard if it required observation of illegal conduct or a traffic infraction. each of which provides an independent legal basis for stopping the vehicle. See Delaware v. Prouse, 440 U.S. 648, 661 (1979)(a police officer may stop a vehicle "[w]hen there is ... probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations" relating to the operation of motor vehicles).

The defendant also argues that it is normal for a driver to look straight ahead, and that his failure to make eye contact with law enforcement may not be considered when determining the existence of reasonable suspicion. However, the Eleventh Circuit recently held in United States v. Bautista-Silva, supra, that the behavior of the vehicle's passengers, including "look[ing] straight ahead," may be considered in determining the existence of reasonable suspicion. 567 F.3d at 1274. In this case, the defendant's lack of eye contact was just one aspect of the defendant's appearance, and that factor and the defendant's unnaturally rigid posture and death-like grip on the steering wheel are appropriately included in the totality of circumstances in assessing reasonable suspicion. Therefore, the defendant's lack of eye contact was properly considered. See id.

With regard to the defendant's contention that the agents' conduct was purportedly calculated to incite suspicious behavior, the memorandum of law does not specify what conduct he had in mind. At the hearing, defense counsel argued that being "sandwiched" between two border patrol vehicles, i.e., a border patrol car directly in front and in back of the defendant, could have made him nervous. However, Agent Fiorita testified

that the defendant was not "sandwiched" between two patrol cars at any time. In fact, there is no evidence that the defendant was even aware that Agent Garcia was following him. In all events, simply because there could be an innocent explanation for the defendant's actions does not make the officer's suspicions unreasonable. See United States v. Arvizu, supra, 534 U.S. at 277 ("A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct.").

Defense counsel also argued that that there is nothing suspicious about Hispanic drivers in Florida, minivans with California license plates on an interstate highway, or tinted windows. Moreover, he contends that driving on I-75 does not warrant any special consideration.

However, as the Government aptly responds, the Supreme Court has rejected this "divide-and-conquer" analysis. See United States v. Arvizu, supra, 534 U.S. at 274. Thus, the court "may not consider each fact only in isolation, and reasonable suspicion may exist even if each fact alone is susceptible of innocent explanation." United States v. Bautista-Silva, supra, 567 F.3d at 1272-73.

Furthermore, in Agent Fiorita's experience, each of these factors was probative of illegal alien smuggling. See United States v. Brignoni-Ponce, supra, 422 U.S. at 885 ("In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling."). Thus, although defense counsel does not believe I-75 is an alien "hot spot," Agent Fiorita testified that, on October 2, 2009, he knew I-75 was a major corridor for alien smuggling due to its link with major interstate highways from southwest border states, and that his office in Tampa had an ongoing operation to interdict human trafficking on I-75 for that reason. Further, Agent Fiorita testified that, in his experience, Hispanic males are typically the drivers of alien smuggling vehicles. Therefore, this is also a relevant consideration. See United States v. Brignoni- Ponce, supra, 422 U.S. at 886-87 ("The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens."). Moreover, due consideration was given to the characteristics of the vehicle, as Agent Fiorita testified that vehicles smuggling illegal aliens are frequently larger vehicles with tinted windows

and registered in a southwest border state. Therefore, these factors support a finding of reasonable suspicion.

In addition, at the hearing the defendant seemed to acknowledge the weight of the fact that the vehicle was registered to an individual who had been deported twice. The defendant had no argument that meaningfully diminished the significance of that factor.

In sum, the uncontroverted evidence shows that Agent Fiorita had a reasonable suspicion that the minivan driven by the defendant on October 2, 2009, was transporting illegal aliens. Accordingly, Agent Fiorita legally stopped the minivan, and the evidence derived from that stop should not be suppressed.

## IV.

The Government has also argued that, even if the stop were illegal, the defendant would not have standing to object to the arrest of his person or evidence of his identity (Doc. 19, pp. 5-6). This contention is based upon the Supreme Court's statement in I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984), that "[t]he 'body,' or identity of a defendant ... in a criminal ... proceeding is never itself suppressible as a fruit of an unlawful

arrest, even if it is conceded that an unlawful arrest, search or interrogation occurred."

It is clear that, pursuant to Lopez-Mendoza, an illegal seizure does not preclude a court from exercising personal jurisdiction over a defendant. However, there is no Eleventh Circuit precedent regarding whether Lopez-Mendoza more broadly prohibits the suppression of illegally obtained evidence of a defendant's identity, such as the defendant's name, fingerprints, or photographs. Furthermore, a conflict exists among the courts of appeals regarding whether Lopez-Mendoza precludes suppression of such evidence. Compare United States v. Guzman-Bruno, 27 F.3d 420 (9th Cir. 1994), cert. denied, 513 U.S. 975 (1994) and United States v. Roque-Villanueva, 175 F.3d 345 (5th Cir. 1999), with United States v. Oscar-Torres, 507 F.3d 224 (4th Cir. 2007) and United States v. Olivares-Rangel, 458 F.3d 1104 (10th Cir. 2006).

The defendant's failure to identify with specificity the evidence he seeks to suppress adds to the difficulty in analyzing this issue. See Doc. 17, p. 1 (motion to suppress "all evidence obtained after the stop" including "statements made by the defendant, observations made [by] the law

enforcement agents after the stop and any other evidence which was discovered after the stop of the vehicle"). However, it is unnecessary to resolve this issue because reasonable suspicion existed to stop the minivan and, therefore, the seizure was legal.

V.

In sum, the defendant argues that all of the evidence acquired after the minivan he was driving on the morning of October 2, 2009, was stopped must be suppressed because law enforcement did not have a reasonable suspicion of criminal activity in the minivan. However, the stop of the minivan was lawful because Agent Fiorita had a reasonable suspicion that illegal aliens were being transported in the minivan. I therefore recommend that the defendant's Motion to Suppress Evidence and Statements (Doc. 17) be denied.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: FEBRUARY 4, 2010

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. 636(b)(1).